IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
March 1, 2016 Session

## AMEALE HUDSON v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Madison County**
**No. 13267      Kyle Atkins, Judge**

_____

**No. W2015-01096-CCA-R3-PC  -  Filed May 3, 2016**

_____

The Petitioner, Ameale Hudson, appeals from the denial of his petition for post-conviction relief.  The Petitioner contends that he was denied the effective assistance of counsel based upon trial counsel's failure to include in his motion for new trial the issue of the trial court's denial of two of the Petitioner's pretrial motions, which resulted in the waiver of the issues on direct appeal.  He further asserts that the cumulative effect of trial counsel's errors entitles him to post-conviction relief.  After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT H. MONTGOMERY, J., joined.

Joshua B. Dougan, Jackson, Tennessee, for the appellant, Ameale Hudson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Jerry Woodall, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I. Factual and Procedural History

Before trial, the Petitioner filed a motion to bar all parties from referring to the Petitioner by his nickname, "Pistol," and a motion to prohibit the display of photographs

to the jury of the victim either before or after his death.[1] Following a hearing, the trial court denied both motions. Regarding the issue of the Petitioner's nickname, the trial court found that witnesses should be allowed to refer to the defendant as "Pistol" "where necessary for identification purposes." The trial court also ruled that the photographs of the victim before and after his death "may be relevant and admissible." The trial court instructed the State to show defense counsel any photographs of the victim it intended to enter into evidence in order to allow defense counsel the opportunity to seek a side bar conference before the entry of the photographs.

Following a trial in the Madison County Circuit Court, a jury found the Petitioner guilty of first degree felony murder and especially aggravated robbery, and the trial court imposed an effective sentence of life imprisonment in the Department of Correction. See State v. Ameale Hudson, No. W2010-02625-CCA-R3-CD, 2012 WL 4044841, at *1 (Tenn. Crim. App. Sept. 14, 2012), perm. app. denied (Tenn. Feb. 13, 2013). On direct appeal, this court summarized the facts at trial, as follows:

> The [Petitioner's] charges stemmed from the death of the victim, Troy Mitchell. At trial, Johnnie McKinnie, a maintenance man who worked at Guardian Courts Apartments, testified that he was at the complex on the morning of October 28, 2009. McKinnie's coworker, Darryl Wayne Kizer, was having car trouble, and McKinnie attached a chain from his truck to Kizer's car to pull it up the hill of the apartment complex. At the top of the hill, the men saw the victim, who was a locksmith and the owner of Mitchell's Lock and Safe, working on a yellow Chevrolet Cavalier that was parked outside apartment 220, the [Petitioner's] apartment, which was located on the bottom floor. The victim's van was parked "catty cornered" to the building. McKinnie asked the victim to move his van for a moment so McKinnie could tow Kizer's car beyond it. The victim complied then went back to work on the yellow car.
>
> While McKinnie and Kizer were removing the chain from Kizer's car, the [Petitioner], whom McKinnie knew as "Pistol," came outside and "started . . . cussing and rushing people[ ] away." McKinnie heard the [Petitioner] say, "Hurry up. Let's get the H–E–L–L out of here. These folks got to go to school." McKinnie said that the [Petitioner] was six to ten feet away from the victim and that he was "scoping" the victim, repeatedly glancing at him. McKinnie saw the [Petitioner] make hand

---

[1] To assist in the resolution of this proceeding, we take judicial notice of the record from the Petitioner's direct appeal. See Tenn. R. App. P. 13(c); State v. Lawson, 291 S.W.3d 864, 869 (Tenn. 2009); State ex rel Wilkerson v. Bomar, 376 S.W.2d 451, 453 (Tenn. 1964).

signals to communicate with two men, one of whom was Justin Gray. The men were standing at the [Petitioner's] open, bedroom window and watching the [Petitioner]. McKinnie thought the [Petitioner] "was up to something," but he and Kizer left before anything happened. Later, McKinnie identified the [Petitioner] and Gray from a photograph line-up.

Kizer testified consistently with McKinnie, noting that when the [Petitioner] tried to make them leave, he pushed and shook Kizer's car even though it was not blocking any vehicle.

Montrez McAlister testified that around 9:45 or 10:00 a.m. the morning of the shooting, he went to apartment 220 where he saw the [Petitioner], whom he knew as "Pistol"; Gray; and another man he referred to as "Dude." "Dude" was later identified as Cornelius Roberson. The [Petitioner's] fourteen-or fifteen-year-old sister, Calvinette, was asleep on the living room couch. McAlister assumed that the [Petitioner's] mother was next door with her boyfriend. McAlister recalled that the victim's locksmith van and a yellow car were in front of the [Petitioner's] bedroom window. He identified the window from a photograph.

McAlister testified that when he walked into the apartment, Gray was putting a navy blue bandana with designs on it around his face, covering his mouth and nose. McAlister stated that the blue bandana depicted in Exhibit 19, which was a photograph, looked like the one Gray wore at the time of the shooting. Gray was dressed in a black jacket turned insideout, a black hoodie with the hood pulled over his head, black pants, and black "Air Force 1 low top" tennis shoes. McAlister said that the [Petitioner] handed Gray a black .22 or .25 caliber "six shooter" revolver and told Gray that "[o]h, when he get through handling their business, just put it [the gun] back and we're going to take all this stuff off when you get done." McAlister said that he did not know to what "business" the [Petitioner] was referring.

McAlister said Gray left the apartment with the gun in his pocket. McAlister went to the back of the apartment and asked Roberson what was going on, and Roberson responded, "I guess Justin [Gray is] fixing to do something stupid." McAlister heard a loud noise and looked out of the [Petitioner's] bedroom window. He saw Gray "coming up out of the [yellow] car like he—in a pulling motion, like he were pulling something out." Afterward, Gray ran around the building and returned to the [Petitioner's] apartment. The [Petitioner] opened the door, and Gray threw

- 3 -

the revolver and bandana in the apartment. Then, Gray and the [Petitioner] walked toward Hollywood Drive. McAlister said he left the [Petitioner's] apartment because he thought that Gray had stolen a CD player from the car.

McAlister conceded that his first statement to police on November 4, 2009, in which he stated that he heard the shot while standing outside, was false. He explained that he was not truthful because he was afraid that if he admitted being in the apartment, he would be charged with a crime. Later that same day, McAlister gave a second statement to police in which he acknowledged that he was in the [Petitioner's] bedroom at the time of the shooting. McAlister said that he had a clear view of events from the window. Additionally, McAlister identified Gray from a photograph line-up. McAlister acknowledged that his nickname was "Money."

Darlene Echols testified that at the time of the shooting, she lived in apartment 130 of Guardian Courts Apartments. That morning, she saw a man, whom she later identified from a photograph line-up as "Justin [Gray]," and the [Petitioner], whom she knew as Pistol, "running from Guardian Courts Apartments, running on Hollywood to the blue house." She said that as they ran, the men looked behind them toward the [Petitioner's] apartment. She noticed them because "[i]t's unusual for people to run through the projects." A few minutes later, Echols heard an ambulance and the police arrive. She walked toward the commotion and learned that a man had been shot. Shortly thereafter, she went back to her apartment. She saw the [Petitioner's] girlfriend pull into a driveway, the [Petitioner] quickly got into the car, and the car "zoomed off." Gray did not get into the car, and Echols did not see where he went.

Echols stated that she knew the [Petitioner] and his family "from the neighborhood." She said that young boys in the neighborhood "mostly hang around" and that when the [Petitioner] "got out of jail he sort of someway claimed the younger boys to his house, you know. He hang around with the older boys, he hung around with the younger boys." She stated that she stopped her sixteen-year-old son from associating with the [Petitioner], explaining, "They always hang around with him. Too tough, you know . . . . I just didn't like him." She said that she did not want her son "hanging around that spot" because "there's a lot of drugs and stuff like that being—dealing around in that area."

- 4 -

Jasmine Carlson, the [Petitioner's] girlfriend, testified that the [Petitioner] spent the night of October 27 with her, and, on her way to college the next morning, she drove the [Petitioner] to apartment 220 in her silver Pontiac Grand Am. She picked the [Petitioner] up later in the day but could not recall the exact time or location. She did not believe that she picked the [Petitioner] up from anyone's driveway. Carlson stated that the [Petitioner] and Gray were "buddies," that they were frequently together, and that the [Petitioner] called Gray "his little brother." On cross-examination, Carlson said that she did not see the [Petitioner] with a gun on the night of October 27. She stated that the next day, she picked the [Petitioner] up after she attended chapel at Lane University, maintaining that "[c]hapel is over at about twelve, twelve-thirty."

. . . .

Jackson Police Officer Ted Maxwell testified that on the morning of October 28, 2009, he was dispatched to 1170 Hollywood Drive, the location of the Guardian Courts Apartments complex, following a report of a possible shooting. When Officer Maxwell arrived, he saw some people gathered around a yellow Chevrolet Cavalier. The driver's side door of the car was open, and the victim was sitting on the ground with his back against the car. The victim's face was bleeding, he was awake, but he was not coherent. An ambulance arrived, and some of the blood was removed from the victim's face, revealing "a possible bullet entry" at the bridge of the victim's nose.

. . . .

Jackson Police Investigator Chris Chestnut testified that on October 28, 2009, he responded to a report that a man had been shot at Guardian Courts Apartments. Upon his arrival, Investigator Chestnut saw "several police officers already on the scene, an ambulance, a vehicle belonging to a locksmith, and a yellow car that had some blood on the ground beside it." As the victim was loaded into the ambulance, Investigator Chestnut took photographs of him. After the ambulance left, Investigator Chestnut photographed the scene then went to the hospital. While at the hospital, Investigator Chestnut saw that the victim had a single gunshot wound that appeared to be from a small caliber bullet. The bullet had entered the left side of the victim's nose.

When the victim was taken for a CAT scan, Investigator Chestnut spoke with the victim's family. During the conversation, Investigator Chestnut learned that the victim's black leather wallet and Samsung cellular

telephone were missing. Thereafter, he returned to the scene to assist with the search of the area.

As Investigator Chestnut and Sergeant Mike Doran were searching the apartment complex, a maintenance man, Mr. Patterson, asked the officers what they were doing. After being informed of the reasons for the officers' presence, Mr. Patterson told Investigator Chestnut that earlier that day, he had locked some vacant apartments "that were standing open," one of which was apartment 210. Patterson unlocked the apartments for Investigator Chestnut and Sergeant Doran to search. During the search, Sergeant Doran alerted Investigator Chestnut that he had found a black Samsung telephone in a drawer under the bathroom sink in apartment 210. In a cabinet underneath the drawer, Investigator Chestnut found digital scales, small Ziploc bags, and rubber gloves, which he described as drug paraphernalia. Later, the victim's son, Larry Joe Mitchell, confirmed that the telephone belonged to the victim.

Mike Doran, a sergeant with the Madison County Sheriff's Department assigned to the Metro Narcotics Unit, testified that on the afternoon of October 29, 2009, he was called to the scene to assist in searching the apartment complex. He stated that "several other investigators [from] the Narcotics Unit, the Gang Unit, and the Jackson Police Department Violent Crimes Unit" were also involved in the search. Sergeant Doran said that he and Investigator Chris Chestnut entered apartment 210, which was vacant. In a bathroom drawer, Sergeant Doran found a black Samsung telephone. Sergeant Doran informed Investigator Chestnut of his discovery.

. . . .

Investigator Terry Buckley testified that on the day of the shooting, the [Petitioner] was developed as a suspect and was brought to the police station for an interview. After being informed of his Miranda rights, the [Petitioner] waived his rights and agreed to speak with police. The [Petitioner] initially told Investigator Buckley that he had spent the previous evening with his girlfriend, Jasmine Carlson, and that she had driven him to his mother's apartment the next morning. He spoke briefly with "a dude" and went inside. He played music for five to ten minutes, walked to Brookfield, then returned home. Thereafter, the [Petitioner] went back to Brookfield; on the way, he saw people "hovering" around a car, then police and an ambulance arrived. The [Petitioner] left and "hung out"

for a while before returning to Guardian Courts Apartments where he was apprehended by police. The [Petitioner] maintained, "I didn't have anything to do with Dude getting robbed or shot and I don't know anything about it or who did it."

On November 4, 2009, Investigator Tyreece Miller, the head of the Jackson Police Department's Violent Crimes Unit, brought the [Petitioner] in for a second interview. During the first part of the interview, the [Petitioner] acknowledged that he had been in apartment 210 where the victim's cellular telephone was found, maintaining that on October 9 or 10 a girl gave him oral sex in that apartment. The [Petitioner] also said that his fingerprints would be on scales and plastic bags that were in a bathroom cabinet in apartment 210 because he put those items there. Investigator Miller said that the cabinet where the drug paraphernalia was found was located directly under the drawer where the victim's cellular telephone was discovered.

The interview was suspended for a break, and, when it resumed, the [Petitioner] said that he had spent the night of October 27 with Carlson. The next morning, Carlson drove to class at Lane University, taking her cousin, Robin, with her. On the way to school, Carlson took him to apartment 220 where his mother lived. The [Petitioner] said that Calvinette, Gray, Roberson, and a man he knew as "Money" were in the apartment. The [Petitioner], Gray, and Roberson went in the [Petitioner's] bedroom then went outside for a few minutes. The [Petitioner] walked to Brookfield and returned to apartment 220 approximately ten to fifteen minutes later. The [Petitioner] saw "Money," which was McAlister's nickname, outside; Gray and Roberson were in the [Petitioner's] bedroom. The [Petitioner] saw the victim driving around "looking for the car" before he began working on a yellow car. The [Petitioner] and McAlister went back to Brookfield. Gray and Roberson stayed in the [Petitioner's] bedroom.

When the [Petitioner] and McAlister returned, the victim was working inside the car. The [Petitioner] and McAlister went in the apartment, and Gray and Roberson called the [Petitioner] over to the window. The [Petitioner] said, "My bedroom window overlooks the parking lot and you can look out my bedroom window and see the locksmith." Gray said, "Let's rob him." The [Petitioner's] replied, "No." Gray and Roberson asked "[w]hat we going to do?" The [Petitioner] responded, "I ain't doing shit," and Roberson agreed with the [Petitioner].

The [Petitioner] said that Gray "got up the nerve to go rob him" and went outside. The [Petitioner], McAlister, and Roberson followed Gray outside. After the [Petitioner] smoked a cigarette, the four men went back to the [Petitioner's] bedroom. Gray said, "I'm fixing to go—I'm fixing to do it," and the four men went back outside. Gray "ran up on" the victim, pointed the gun at him, and took the victim's wallet. The [Petitioner] stated that "the gun went off. Everybody went their separate ways," with the [Petitioner] going back to Brookfield alone.

Investigator Miller testified that around 5:30 p.m., they took a break and got food from Burger King for the [Petitioner] and resumed at 7:45 p.m. Investigator Miller said that "during the time that we started back," the [Petitioner] gave information about McAlister's whereabouts. Investigator Miller had other officers locate McAlister and bring him in for an interview. During the interview, McAlister implicated the [Petitioner] in the crime. Investigator Miller explained, "[T]hat was the reason for the last interview that we did."

In his final version of events, the [Petitioner] said:

"When I first got home that morning, [Gray, Roberson, and McAlister] were inside my apartment. There was a gun laying on my bed. The gun was a black revolver. I handed [Gray] the gun and told him to get this away from me because I'm on ten years paper, [meaning on probation].

"I left and went to Brookfield and came back. [Gray, Roberson, and McAlister] stayed there. When I came back [Gray and Roberson] called me to the window. [McAlister] was just in the room. He really didn't say anything.

"[Gray and Roberson were] talking about robbing the locksmith that was working on the yellow car. I went out—I went inside the house. I told [Gray], 'If you going to rob him, then rob him. You got the gun. I ain't got shit to do with this.'

"Everybody went outside. [Gray] shot and robbed him. We went back inside my apartment. [Gray] had on his solid black hoody coat. He had something covering his face.

- 8 -

[Gray] had the locksmith's wallet and phone. That's when we all left and went our separate ways.

"I got out of jail back on October the 8th. I got a revolver on October 9th because I was being threatened. I kept the gun sometimes and [Gray] kept the gun sometimes. This was the same gun that was used in this robbery."

Lieutenant Christopher Wiser, the supervisor of the Gang Enforcement Team, testified that he was involved in the homicide investigation and that he was one of a team of officers who executed a search warrant at Gray's residence at 1221 Hollywood Drive. After they entered the residence, found it unoccupied, and secured the scene, they broke "into two-man search teams per room." Lieutenant Wiser and Sergeant Charles Wayne Mathis searched Gray's bedroom. On a shelf, Lieutenant Wiser found a school progress report bearing Gray's name and some trophies. Also in the bedroom, the officers found two blue bandanas; one was a darker blue and the other was a lighter blue. A photograph of the darker blue bandana was entered into evidence as Exhibit 19. Sergeant Mathis stated that the dark bandana was found lying on top of a pair of black jeans. Sergeant Mathis found a letter addressed to Gray from the State Department of Safety and, in Gray's nightstand, he found a "live .22 bullet." Lieutenant Wiser said that he was present when Gray was arrested at Jackson–Central Merry High School. Lieutenant Wiser acknowledged that he was not aware of any evidence found at Gray's home that could be linked to the [Petitioner].

. . . .

Investigator Buckley was recalled to the stand and testified that while the [Petitioner] was in jail, he had a telephone conversation with his father. Investigator Buckley said that the recording of the conversation reflected that the [Petitioner's] father asked, "Did they find a gun yet?" The [Petitioner] responded, "They got a gun but it ain't [the] gun that was committed in this robbery and this murder." The [Petitioner's] father inquired, "Well, then, you ain't—Where the gun at that you supposed to have gave the boy?" The [Petitioner] replied, "I don't know.

Dr. Feng Li, the medical examiner who performed an autopsy on the victim's body, stated that the manner of the victim's death was homicide and that the cause of death was a gunshot wound to the bridge of the

victim's nose. Dr. Li stated that the victim's eyes were blackened and that the bullet penetrated the cranial cavity, causing several injuries to the brain tissues. From powder tattooing to the victim's skin, Dr. Li deduced that the shot was fired from two-and-a-half to three feet from the victim. Dr. Li retrieved two small bullet fragments from the victim's head. Because of the size of the fragments, Dr. Li believed that the bullet was a small caliber. However, the murder weapon was never recovered.

In the [Petitioner's] defense, his mother, Dorothy Hudson, testified that her father nicknamed the [Petitioner] "Pistol" when she was pregnant and that the [Petitioner] had always been called "Pistol." She said that she lived in apartment 220 but that on the morning of October 28, 2009, she was next door in her boyfriend's apartment. Around 8:00 a.m., she took her dog outside and saw the [Petitioner] walking toward the apartments from Brookfield. When she finished walking her dogs, the [Petitioner] was sitting on the porch of apartment 220. Ms. Hudson testified that she did not hear a gunshot but that she later learned someone had been shot.

The jury found the [Petitioner] guilty of felony murder and especially aggravated robbery. The trial court sentenced the [Petitioner] to life imprisonment for his felony murder conviction and imposed a concurrent sentence of twenty-five years for the especially aggravated robbery conviction.

Ameale Hudson, 2012 WL 4044841, at *1-7.

As grounds for relief on direct appeal, the Petitioner argued that the trial court erred by (1) denying his motion for a change of venue; (2) denying his motion to bar the State from referring to him by his nickname, "Pistol"; and (3) denying his motion to prohibit the admission of postmortem photographs of the victim. The Petitioner also asserted that the evidence was insufficient to support his convictions. Id. at *1. In addressing the Petitioner's claims that the trial court erred in denying his pretrial motions, this court ruled that the Petitioner had waived consideration of the issues by failing to raise them in his motion for new trial. Id. at *7-8. After determining that the evidence was sufficient to sustain the Petitioner's convictions, this court affirmed the judgments of the trial court. Id. at *10.

*Post-Conviction Proceedings*

The Petitioner filed a timely pro se petition for post-conviction relief in September 2013. Following the appointment of counsel, the Petitioner filed an amended petition for

- 10 -

post-conviction relief, to which the State filed a written response. At a subsequent hearing, the Petitioner testified that trial counsel was appointed to represent him before his preliminary hearing and that trial counsel's representation continued through the Petitioner's appeal. The Petitioner stated that he only met with trial counsel to discuss a possible plea bargain and that trial counsel never spoke to him about a defense strategy. The Petitioner recalled that trial counsel filed a motion for discovery and that included in the State's discovery response were photographs of the victim. The Petitioner and trial counsel agreed that the photographs were "gruesome" and should be excluded. Trial counsel filed a motion to exclude the photos; however, the trial court denied the motion after a hearing. The Petitioner recalled that the photographs were later displayed to the jury at trial. According to the Petitioner, trial counsel also filed a pretrial motion for change of venue based upon the publicity received by the Petitioner's case. However, the trial court denied this motion as well.

The Petitioner testified that, following his conviction, trial counsel filed a motion for new trial but that trial counsel failed to include the trial court's denial of his pretrial motions in the motion. As a result, the appellate court found that these issues were waived.

On cross-examination, the Petitioner recalled that the trial court admitted the photographs of the victim because they were relevant to the medical examiner's explanation of cause of death and manner of death. The Petitioner also agreed that the State had been required to prove serious bodily injury as an element of especially aggravated robbery. He stated that the photos were "relevant, but . . . not relevant because I never committed any type of robbery."

Regarding the use of his nickname at trial, the Petitioner said that some of the State's witnesses knew him as "Pistol" but that other witnesses knew his legal name. He agreed that trial counsel called his mother to testify about how he got his nickname. She testified that the Petitioner's grandfather gave the Petitioner the nickname before the Petitioner's birth. Moreover, she testified that the Petitioner's nickname was not based upon the Petitioner's use of pistols.

Trial counsel testified that, following his appointment to represent the Petitioner, he filed several pretrial motions, including a motion for change of venue, motion to prohibit the use of the Petitioner's nickname, "Pistol," and a motion to exclude photographs of the victim. Trial counsel acknowledged that he did not argue these issues in the Petitioner's motion for new trial. Instead, he made a "strategic decision" to focus the motion for new trial on the sufficiency of the evidence and on the argument that the State's key witnesses were unindicted co-conspirators.

Regarding the use of the Petitioner's nickname by the State and its witnesses, trial counsel stated that it was "an identification issue." Trial counsel stated that the defense addressed the issue of the Petitioner's nickname at trial so that the jury understood it was a childhood nickname given to the Petitioner by his grandfather. Trial counsel recalled that he reviewed the trial testimony at the end of each day of trial and concluded, "I just didn't see where the nickname—where Pistol was playing a big role. I don't feel like the prosecution abused it."

Trial counsel testified that the photographs of the victim were "fairly clinical in nature," and he noted that the trial court found that the photos were relevant to the issue of serious bodily injury. Additionally, the number of photographs actually shown to the jury was small. Trial counsel stated that he did not think that the appellate court would overrule the trial court on the issue.

On cross-examination, trial counsel testified that he had practiced law for about fifteen years and that a large percentage of his practice was in criminal law. Trial counsel agreed that the pretrial motions filed by the defense were not frivolous and that they had a reasonable ground in law and fact. He recalled that the trial judge conducted an extensive hearing on the motions and issued thorough rulings.

Trial counsel stated that, during trial, he paid attention to the issue of the use of the Petitioner's nickname. Counsel took notes on when the nickname was used and in what context, and he reviewed those notes each night during the trial. He stated that, at the conclusion of the trial, he "did not find that it played that much of a factor." Trial counsel recalled that most of the references to "Pistol" came from witness testimony. As a result, he was "put in that position as to whether to just let it go or raise an objection and bring more attention to it." Trial counsel testified that, in hindsight, he did not believe that the use of the Petitioner's nickname was "that big of an issue," although he acknowledged that he did not know what impact, if any, it had on the jury.

Regarding his failure to raise in the Petitioner's motion for new trial the issue of the trial court's denial of these motions, trial counsel explained that,

[A]fter fifteen years, it's my practice to try to narrow down the issue that I feel like is going to give my client the best opportunity for some sort of relief. In this case, after hearing all the trial testimony I felt like that a sufficiency of the evidence argument was going to be . . . [the Petitioner's] best chance of post[-]trial relief.

Following the hearing, the post-conviction court entered a written order denying relief. This timely appeal follows.

## II. Analysis

The Petitioner asserts that he was denied the effective assistance of counsel based upon trial counsel's failure to preserve as issues for appeal the trial court's denial of the motion to prohibit the use of his nickname, "Pistol," and the motion to exclude photographs of the victim. He contends that, although his nickname had no relevance, it nonetheless "saturated" the trial testimony such that the jury likely concluded, based upon the Petitioner's nickname, that the Petitioner instructed his co-defendant to engage in the robbery and murder. The Petitioner also contends that the "gruesome" photographs of the victim had no probative value and that, even if they did hold some relevance, the danger of unfair prejudice far outweighed any probative value. Finally, the Petitioner asserts that the cumulative effect of counsel's errors necessitates the granting of post-conviction relief.

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. Jaco v. State, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. Kendrick v. State, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. Id.; Fields, 40 S.W.3d at 456 (citing Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." Fields, 40 S.W.3d at 456 (citing Henley, 960 S.W.2d at 579); see also Kendrick, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. Kendrick, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for a court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not

satisfied, there is no need to consider the other factor. Finch v. State, 226 S.W.3d 307, 316 (Tenn. 2007) (citing Carpenter v. State, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694) (internal quotation marks omitted).

### A. Failure to Preserve Issues for Appeal

A defendant has a right to effective representation both at trial and on direct appeal. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995) (citing Evitts v. Lucey, 469 U.S. 387 (1985)). The test for ineffective assistance of counsel is the same for both trial and appellate counsel, under the Strickland standard set forth above. Id. That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." Id. at 597; see also Carpenter v. State, 126 S.W.3d 879, 886-88 (Tenn. 2004).

Regarding claims of ineffective assistance by appellate counsel, our supreme court has provided:

Appellate counsel are not constitutionally required to raise every conceivable issue on appeal. Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues. The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion. Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

Carpenter, 126 S.W.3d at 887 (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999); Campbell, 904 S.W.2d at 596-97).

When a petitioner alleges that trial counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue. Id. "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it." Id. Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim. Id. at 887-88.

In this case, the post-conviction court found no deficient performance or prejudice based upon counsel's failure to preserve as an issue for appeal the denial of the Petitioner's motions to prohibit the use of his nickname and to exclude photographs of the victim. Regarding the use of the Petitioner's nickname at trial, the post-conviction court stated:

In reviewing the transcript, the Court notes that every witness who testified referred to the [Petitioner] by his nickname, ["]Pistol. ["] In fact, most of the witnesses did not know his correct legal name. According to his mother, [the Petitioner] has been called ["]Pistol["] his entire life. Further, all of those witnesses could only identify the [P]etitioner by his nickname "Pistol." The name "Pistol" was not used [ ] in a derogatory manner. It was merely used to identify the [Petitioner]. Therefore, the [P]etitioner has not shown any prejudice from the use of the nickname Pistol.

Turning to the photographs of the victim, the post-conviction court found that "[t]he pictures introduced at trial were very clinical in nature" and "were not gruesome or inflammatory." Moreover, the court concluded that the Petitioner had offered no proof that show that the admission of the photographs had a prejudicial effect at trial.

- 15 -

Finally, the post-conviction court found that trial counsel's decision to omit these issues from the Petitioner's motion for new trial was a strategic decision, stating:

> Trial counsel . . . testified that he chose to leave those issues out of the motion for new trial because he did not want to clutter the issues on appeal. [Trial counsel] testified that he did not feel those issues would be overturned on appeal. Therefore, [trial counsel] wanted to focus the appeal on the lack of corroborating testimony from someone other than a co-conspirator. [Trial counsel] testified that this was a strategy decision. [Trial counsel] testified that he only has a small window to argue at the Court of [Criminal] Appeals. Counsel testified he did not want to spend time addressing issues that he felt the [appellate court] would find harmless error. Therefore, [trial counsel's] strategy was to focus the appeal only on the issue of the uncorroborated testimony from the co-conspirators. The Court finds [trial counsel] to be a credible witness. . . . The Court finds that his strategy of focusing the appeal on the insufficiency of the evidence was within the standard of reasonableness under the prevailing professional norms and was not deficient. Further, the court finds that the petitioner did not prove by clear and convincing evidence that there was any prejudice as a result of the alleged deficient performance.

Applying the analysis outlined in Carpenter, we conclude that the Petitioner has failed to establish deficient performance or prejudice with respect to trial counsel's failure to preserve the two issues that were waived on direct appeal. First, trial counsel was an experienced advocate who testified that he wanted to focus the motion for new trial on the sufficiency of the evidence and on the argument that the State's key witnesses were unindicted co-conspirators, and he made a "strategic decision" not to raise the issue of the pretrial motions in the motion for new trial. Trial counsel stated that, based upon his fifteen years' experience and knowledge of the case, he believed that the sufficiency of the evidence argument was the Petitioner's "best chance of post[-]trial relief," and the post-conviction court accredited this testimony. We give trial counsel's professional judgment considerable deference. See Carpenter, 126 S.W.3d at 887.

### 1. Use of the Petitioner's Nickname

This court has previously stated that "[n]icknames should generally be avoided" during a trial and that "trial judge should closely monitor any misuse." State v. Zirkle, 910 S.W.2d 874, 886 (Tenn. Crim. App. 1995). In this case, the record supports the post-conviction court's findings that the witnesses who used the nickname "Pistol" only knew the Petitioner by his nickname. The nickname was not used in a derogatory manner; rather, it was used to identify the Petitioner. Thus, the Petitioner's nickname was

relevant because it went to establishing his identity. Also, in our examination of the record, we do not believe that the use of the Petitioner's nickname "saturated" the trial to the extent that the record affirmatively shows that it affected the jury's verdict. See State v. Joey Dewayne Thompson, No. E2003-00569-CCA-R3-CD, 2004 WL 1592817, at *10 (Tenn. Crim. App. July 16, 2004) (holding that, while improper, the prosecutor's multiple use of the defendant's name during its questioning of several witnesses was harmless error because the defendant failed to show that the error "affirmatively affected the result of the trial"). As pointed out by the State, of the twenty-two witnesses that testified for the State, only three witnesses relied on the Petitioner's nickname, and they did so because that was how they knew the Petitioner.[2] While the prosecutor did use the Petitioner's nickname several times, the prosecutor did not "misuse[]" the nickname. See Zirkle, 910 S.W.2d at 886. Generally, when using the nickname, the prosecutor was merely repeating a witness's testimony back to the witness in order to clarify the witness's testimony. Moreover, the Petitioner's mother testified that the nickname "Pistol" was not the result of any criminal behavior but was the nickname innocently given to the Petitioner by his grandfather before the Petitioner's birth. Thus, because this issue has no merit, trial counsel was not deficient for failing to include the trial court's denial of the motion to prohibit the use of his nickname as a ground for relief in the Petitioner's motion for new trial, and the Petitioner suffered no prejudice from trial counsel's failure to preserve the issue for appeal.

## 2. Photographs of the Victim

The Petitioner's challenge to the trial court's admission of photographs of the victim is also without merit. "Tennessee courts have consistently followed a policy of liberality in the admission of photographs in both civil and criminal cases." State v. Carter, 114 S.W.3d 895, 902 (Tenn. 2003) (citing State v. Banks, 564 S.W.2d 947, 949 (Tenn. 1978)). "The general rule . . . is that photographs of a murder victim's body are admissible if they are 'relevant to the issues on trial, notwithstanding their gruesome and horrifying character.'" Carter, 114 S.W.3d at 902 (quoting Banks, 564 S.W.2d at 950-51). The admissibility of photographs lies within the discretion of the trial court whose ruling will not be overturned on appeal, except upon "a clear showing of abuse of discretion." Banks, 564 S.W.2d at 948.

At trial, the State introduced four photographs of the victim's face—one before the victim was taken from the scene and three from the victim's autopsy—which depicted a

---

[2] The record from the Petitioner's direct appeal does not include a transcript of the State's opening statement and closing argument; consequently, we have been unable to review those portions of the Petitioner's trial. However, in his brief, the Petitioner does not assert that the State improperly or abusively used his nickname during its opening statement or closing argument.

small entry wound to the bridge of the victim's nose. The photographs were relevant to the State's establishing the cause of death and the element of serious bodily injury required by the charge of especially aggravated robbery. Moreover, we agree with the post-conviction court that the photographs were "clinical in nature" and not gruesome or inflammatory. In this case, there is no clear showing of an abuse of discretion by the trial court in admitting the photographs of the victim. Thus, trial counsel was not deficient for failing to include this issue in the Petitioner's motion for new trial, and the Petitioner suffered no prejudice from trial counsel's failure to preserve the issue for appeal.

The Petitioner has failed to prove that trial counsel's conduct fell below an objective standard of "reasonableness under prevailing professional norms." Finch, 226 S.W.3d at 315 (internal quotations omitted). Furthermore, even if counsel's performance was deficient, the Petitioner has failed to establish prejudice.

### B. Cumulative Error

Finally, the Petitioner asserts that the cumulative effect of trial counsel's errors caused him prejudice. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great at to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). When considering cumulative error, this court may look to the case as a whole, the numbers of errors committed, their interrelationship and combined effect, and the strength of the State's case. Id. (quoting United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993)). In this case, the Petitioner has failed to carry his burden that his counsel deviated from the required standard of assistance. Accordingly, the Petitioner has not established that the cumulative effect of trial counsel's errors resulted in prejudice.

### III. Conclusion

For the aforementioned reasons, the judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 18 -